IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KAREN MALDONADO, et al. | : | CIVIL ACTION |
| | : | |
| v. | : | No. 18-1492 |
| | : | |
| CITY OF PHILADELPHIA | : | |
| DEPARTMENT OF HUMAN | : | |
| SERVICES, et al. | : | |

**MEMORANDUM**

**Juan R. Sánchez, C.J.**                                                              **September 29, 2020**

      Plaintiffs Karen and Anibal Maldonado, the mother and step-father of I.M., bring this action seeking damages for the harm they suffered as a result of an alleged conspiracy between the owners of a dance company with which I.M. was a part, members of the Philadelphia Department of Human Services, and I.M.'s maternal uncle to deprive Mrs. Maldonado of the custody rights over her daughter. The Maldonados bring their claims against Defendants City of Philadelphia, Philadelphia Department of Human Services Former Acting Commissioner Jessica Shapiro, Philadelphia Department of Human Services employees Javier Aguero and Roya Paller, and I.M.'s uncle Christopher Hermann pursuant to 42 U.S.C. § 1983 and Pennsylvania state law. Defendants have moved for summary judgment on all of the Maldonados' claims. Because there are no genuine disputed of material fact and Defendants are entitled to judgment as a matter of law on all of the Maldonados' claims, the Court will grant Defendants' motions.

**BACKGROUND**[1]

Plaintiffs Karen and Anibal Maldonado are the mother and stepfather of I.M.—Mrs. Maldonado's daughter from a prior relationship. During the relevant time period, I.M. was a minor in the custody of Mrs. Maldonado. Around 2007, Mrs. Maldonado enrolled I.M. in dance classes held at Motion N' Dance (Motion), a dance school located in Philadelphia, Pennsylvania and owned and operated by Thomas and Staciann Marcucci. Jessica Gibson—Mrs. Marcucci's mid-twenties daughter—also worked at Motion as a dance instructor. While enrolled at Motion, I.M. began representing Motion in state and national dance competitions, which required I.M. to travel to competition locations with the Marcuccis and Gibson. Through her involvement in these competitions and dance classes, I.M. formed a close relationship with the Marcuccis and Gibson. Due to the closeness I.M. developed with the Marcuccis and Gibson, Mrs. Maldonado became concerned about I.M.'s relationship with them and began limiting her activities with Motion, the Marcuccis, and Gibson.

On July 12, 2016, I.M. ran away from the Maldonados' home. After learning I.M. had run away, Hermann picked up I.M. in Philadelphia and took her to her maternal grandmother's house. *See* Hermann Mot. for Summ. J. Ex. B at ¶ 4. The following day, the Philadelphia Police Department contacted Hermann and instructed him to take I.M. to the Philadelphia Department of Human Services (DHS), which he did on July 14, 2016. *Id.* at ¶¶ 5, 7. At DHS, I.M. met individually with an on-call social worker and reported that she was abused by Mrs. Maldonado. *Id.* at ¶ 8-9. While Hermann and I.M. were at DHS, the Maldonados arrived. DHS supervisor "Ms.

---

[1] In determining whether to grant summary judgment, the court "must view the facts in the light most favorable to the non-moving party, and must make all reasonable inferences in that party's favor." *Hugh v. Butler Cty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005). Except where noted, the facts herein are undisputed.

2

Mary" held separate consultation meetings with Hermann and I.M. and then with the Maldonados. *Id.* at ¶ 9. The meetings ended with an informal agreement for I.M. to temporarily reside with Hermann in Maryland—provided he would not allow I.M. to be in contact with the Marcuccis and Gibson. *Id.* at ¶ 9-10. As a result of I.M.'s report, DHS opened an investigation into Mrs. Maldonado's alleged abuse. DHS Supervisor Aguero assigned Paller to the Maldonado case. *See* Paller & Aguero Mot. for Summ. J. Ex. F, at ¶ 9.

I.M.'s July 14 report of abuse, however, was not the first time I.M. alleged her mother had abused her. Two months prior, I.M. reported to her school and Philadelphia Police that Mrs. Maldonado physically abused her, which led to an investigation by DHS Social Worker Ashley Wingate. On June 13, 2016, Wingate found the allegations of abuse against Mrs. Maldonado unfounded and closed the case. Although DHS social workers have the ability to see if previous allegations were "unfounded," they cannot access the report itself. *See* Paller & Aguero Reply Ex. 1, at ¶ 4. Therefore, pursuant to the DHS's policy to investigate every allegation of abuse, *id.* at ¶ 3, Paller was required to investigate the new allegations of abuse but could not view Wingate's report, *see id.* at ¶ 5.

At a family meeting between Paller and the Maldonados on July 15, 2016, Paller learned of Mrs. Maldonado and Hermann's agreement to have I.M. stay with Hermann in Maryland. *See* Paller & Aguero Mot. for Summ. J. Ex. F, at ¶ 10-11, ECF 72-8. Paller also learned that I.M. previously danced at Motion. *Id.* at ¶ 13. Paller was familiar with Motion because her daughters auditioned at Motion to appear on Party Rockers Tween Scene (PRTS), a local organization that filmed episodes for on demand television channels. *Id.* at ¶ 14-20. Paller also had volunteered at PRTS as their social media manager. Pls.' Resp. to Paller & Aguero Mot. for Summ. J. Ex. F, at PTF 26. Paller left the Maldonados' home and called Aguero, who confirmed she could remain on

the case even though she was familiar with Motion. Paller & Aguero Mot. for Summ. J. Ex. A, at ¶ 108; *id.* Ex. F, at ¶ 13-27.

After the meeting concluded, Paller intended to bring the Maldonados and Hermann together to form a more permanent agreement to replace the informal July 14 agreement. *Id.* Ex. F, at ¶ 31. Prior to doing so, however, Mrs. Maldonado met with Aguero at the DHS office and raised concerns about Paller's investigation and stated she believed Hermann was allowing I.M. to be in contact or be with the Marcuccis. Aguero told Mrs. Maldonado he would "handle it," and call her the next day. *See* Second Am. Compl. ¶ 125.[2] Aguero, however, did not contact Mrs. Maldonado about the Paller investigation afterward. *See id.* at ¶ 126. Nevertheless, Mrs. Maldonado did not contact Aguero about Paller's conduct again. *See* Paller & Aguero Mot. for Summ. J. Ex. E, at ¶ 22.

On August 1, 2016, through Paller, Hermann and Mrs. Maldonado agreed to a more formal "safety plan" whereby I.M. would stay with Hermann until the end of the month. *See id.* Ex. F, at ¶ 40. Hermann allowed I.M. to have contact with the Marcuccis twice during August, believing the new safety plan did not contain any of the conditions or restrictions of the initial, informal agreement. *See* Hermann Mot. for Summ. J. Ex. B, at ¶ 17-18.

Nine days after agreeing to the more formal safety agreement, Hermann filed a petition in the Philadelphia Court of Common Pleas for custody of I.M. and sought expedited relief. *Id.* at ¶ 18. Hermann's petition claimed I.M. was "mentally abused in her own home." *See* Paller &

---

[2] Although the source of this fact is the Maldonados' Second Amended Complaint, the Court will consider it because the Second Amended Complaint is verified and the allegation is specific and based on personal knowledge. *See, e.g.*, *Boomer v. Lewis*, No. 06-850, 2009 WL 2900778, at *2 n.4 (M.D. Pa. Sept. 9, 2009) ("A verified complaint may be treated as an affidavit in support of or in opposition to a motion for summary judgment if the allegations are specific and based on personal knowledge.").

Aguero Mot. for Summ. J. Ex. H. On August 11, 2016, Paller concluded the allegations of abuse were unfounded. *Id.* Ex. R. After the safety plan expired, Hermann did not return I.M. to the Maldonados in Philadelphia.

On September 16, 2016, Judge Diane Thompson held a hearing on Hermann's petition. *See* Pls.' Resp. to City & Shapiro Mot. for Summ. J. Ex. E, at 1. Hermann, the Maldonados, and I.M. attended the hearing. Paller attended the hearing as well, but Judge Thompson instructed her to leave and she waited in the hallway until the proceedings ended. *See* Paller & Aguero Mot. for Summ. J. Ex. K, at ¶ 19-21. At the hearing, Judge Thompson learned Hermann enrolled I.M. in school in Maryland, despite him not having the authority to do so. *Id.* at ¶ 3-12. Judge Thompson ordered I.M. to return to her mother in Philadelphia immediately and to have I.M. and Mrs. Maldonado placed into therapy together. *Id.* at ¶ 16-19. I.M. ran out of the courtroom and was stopped by Paller in the hallway who told I.M. to go back into the courtroom. *Id.* Ex. F, at ¶ 43. I.M. entered the courtroom and told Judge Thompson that, if she returned home, Mrs. Maldonado would abuse her, and she feared for her life. *See* City & Shapiro Mot. For Summ. J. Ex. A, at ¶¶ 4-7, 12-14. I.M. testified her mother had previously swung a bat toward her face but missed and she pushed I.M. around her room. *Id.* at ¶¶ 21-22, 1-8. Upon hearing I.M.'s testimony, Judge Thompson amended her order and placed I.M. in protective custody with DHS. *Id.* at ¶ 9-16. Judge Thompson relinquished jurisdiction to Judge Vincent Furlong and a shelter care hearing scheduled for September 19, 2016. *Id.* Ex. D, at ¶ 8-10.

Following the hearing, Mrs. Maldonado's attorney Soleiman Raie, emailed Acting DHS Commissioner Shapiro and expressed concerns about Paller's investigation, her presence at the hearing, and stopping I.M. from running out of the courthouse. *See id.* Ex. C, at ¶ 5,6; Paller & Aguero Mot. for Summ. J. Ex. F at ¶ 44. This was not the first time Mrs. Maldonado attempted to

contact Shapiro via email to express her concerns about Paller, but it was the first time Shapiro became aware of the situation. City & Shapiro Mot. for Summ. J. Ex. B, at ¶¶ 8, 31. Shapiro responded to Attorney Raie two days later saying she would look into the issues raised and get back to him shortly. *See id.* at ¶ 11. Shapiro then immediately forwarded the email to her colleagues, including DHS Deputy Commissioner Gary Williams, Williams's Chief-of-Staff Miriam Hayes, and Executive Assistant Francis Beatrice. *Id.* at ¶ 12. She also copied Jonathan Houlon on the email—a member of the DHS Law Department's Child Welfare Unit. *Id.* at ¶ 13. Only a few minutes later, Houlon responded, saying he was aware of the case and he wanted to meet with Shapiro before the shelter care hearing for I.M. the next day. *Id.* at ¶ 18. Shapiro and Houlon spoke and decided it would be best to soon remove Paller from the case. *Id.* at. ¶ 19. Shortly before the September 19 hearing, Paller was removed as social worker for the Maldonados' case. Paller & Aguero Mot. for Summ. J. Ex. F, at ¶ 54.

On September 19, 2016, the shelter care hearing took place before Judge Vincent Furlong. *See* City & Shapiro Mot. for Summ. J. Ex. D, at 1. DHS Representative Donna Shinn, DHS Social Work Supervisor Stacey Moultrie, I.M., and the Maldonados were present at the hearing. *Id.* at 3. Paller and Hermann were also seated in the back of the courtroom. *Id.* at 3-4. At the beginning of the hearing, Judge Furlong granted a sequestration motion, and Hermann and Paller were removed from the courtroom. *Id.* at 3-11. At the hearing, Mrs. Maldonado testified she wanted I.M. to be a in a safe environment and that Hermann had allowed I.M. to be in contact with the Marcuccis and Gibson. *Id.* at 8-9, 23-25. Judge Furlong, however, ordered I.M. to reside with Hermann temporarily until an adjudicatory hearing could be held on September 27, 2016. *Id.* at 22-25. He further ordered I.M. to continue attending school in Maryland but to have no contact with the Marcuccis or Gibson. *Id.* at 22-25.

After the hearing, Attorney Raie sent another email to Shapiro expressing his concerns about the I.M. case to which Shapiro responded that she was looking into the issues raised. *See City & Shapiro Mot. for Summ. J. Ex. B, at ¶ 20-22.* On September 20, 2016, Shapiro emailed the City's Inspector General Amy Kurland about the I.M. investigation and the Inspector General's Office took over the investigation soon after. *Id.* at ¶ 26-27.

On September 27, 2016, the adjudicatory hearing took place before Judge Furlong. *See id.* Ex. E, at 1. Moultrie, DHS Social Worker Marie Griffin—who replaced Paller on the Maldonado case, Child Advocate Janice Clark, the Maldonados, Hermann and I.M. attended the hearing. *Id.* at 3. At the hearing, I.M. testified she was physically and mentally abused by her mother and she was afraid to return home. *Id.* at 9, 13. After hearing testimony from DHS employees and from Mrs. Maldonado, Judge Furlong found it was in I.M's best interest to remain with Hermann in Maryland. *Id.* at 37. Hermann was granted temporary legal custody of I.M. *Id.* at 38. In October 2016, Griffin closed the Maldonado case because she was safe in Maryland with Hermann. Pls.' Resp. to City & Shapiro Mot. Ex. C, at PTF 639, 643. On February 14, 2017, I.M. turned eighteen and was emancipated by the end of the year.

On April 10, 2018, the Maldonados commenced this action by filing a complaint asserting different civil rights and tort claims against three groups of Defendants: Paller and Aguero (the DHS Defendants); then-DHS Acting Commissioner Shapiro and the City of Philadelphia (the City Defendants); and Hermann.[3] Each group of Defendants has separately moved for summary judgment on all claims against them.

---

[3] The Maldonados also brought claims against Motion, the Marcuccis, and Gibson. These Defendants, however, have since been dismissed.

## DISCUSSION

A motion for summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine" dispute is one where "the evidence is such that a reasonable jury could return a verdict for the [non-moving] party." *Id.*

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (citation and internal quotation marks omitted). To defeat summary judgment, "the non-moving party must present more than a mere scintilla of evidence; there must be evidence on which the jury could reasonably find for the [non-movant]." *Burton v. Teleflex, Inc.*, 707 F.3d 417, 425 (3d Cir. 2013) (alteration in original) (citation and internal quotation marks omitted).

Because there are no genuine disputes of material fact and Defendants are entitled to judgment as a matter of law on all of the Maldonados' claims, the Court will grant Defendants' motions for summary judgment. The Court will address each motion in turn.

### I.       Roya Paller and Javier Aguero's Motion for Summary Judgment

Mrs. Maldonado brings the following claims: (1) deprivation of the right to the care, custody, and control of I.M. pursuant to 42 U.S.C. § 1983 against Paller and Aguero, (2) negligent supervision against Aguero, (3) fraud against Paller, and (4) intentional infliction of emotional distress against Paller. Mr. Maldonado also brings a derivative loss of consortium against Paller.

Because the undisputed facts show the Maldonados' claims against Paller and Aguero fail as matter of law and Paller and Aguero are entitled to judgment, the Court will grant their motion for summary judgment.

First, Mrs. Maldonado's § 1983 claim against Paller fails because Paller's actions did not violate Mrs. Maldonado's Fourteenth Amendment right to the care, custody, and control of I.M. Section 1983 creates a federal statutory mechanism for private individuals to vindicate deprivations of their constitutional rights by actors personally involved in the alleged deprivation.[4] *See Albright v. Oliver*, 510 U.S.C. 266, 271 (1994) ("Section 1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." (internal quotations omitted)). To prevail on her claim, Mrs. Maldonado must produce evidence that "a person acting under color of state law engaged in conduct that violated a right protected by the Constitution or laws of the United States." *Morrow v. Balaski*, 719 F.3d 160, 165-66 (3d Cir. 2013).

The Supreme Court has recognized a parent's constitutional right to the care, custody, and control of children under the Fourteenth Amendment. *Troxel v. Granville*, 530 U.S. 57, 72-73 (2000). "[A] state has no interest in protecting children from their parents unless it has some reasonable and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is in imminent danger of abuse." *Croft v. Westmoreland Cty. Children & Youth Servs.*,

---

[4] Under 42 U.S.C. § 1983:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

103 F.3d 1123, 1126 (3d Cir. 1997) (internal citations omitted). When a child welfare worker removes a child from the care of his or her parent, the worker violates the parent's substantive due process rights "where [the welfare worker's] actions 'exceed both negligence and deliberate indifference, and reach a level of gross negligence or arbitrariness that indeed shocks the conscience.'" *Dennis v. DeJong*, 867 F. Supp. 2d 588, 637-38 (E.D. Pa. 2011) (quoting *Miller v. City of Philadelphia*, 174 F.3d 368, 375-76 (3d Cir. 1999)).

Here, Paller did not violate Mrs. Maldonado's Fourteenth Amendment rights because she had reasonable suspicion to investigate I.M.'s reports of abuse and her conduct did not cause I.M.'s removal from Mrs. Maldonado. In this instance, I.M. self-reported that Mrs. Maldonado abused her to the police and DHS on two separate occasions. Even though a previous investigation did not substantiate I.M.'s original abuse claim, DHS policy was to investigate every report of abuse regardless of previous unfounded reports. Thus, Paller had a duty and objectively reasonable suspicion to reinvestigate Mrs. Maldonado based on I.M.'s renewed complaints of abuse. *See Miller*, 174 F.3d at 377 (granting summary judgment for a welfare worker when the worker relied upon a reasonable belief that the children were in danger of abuse). Moreover, the Court finds the undisputed facts do not demonstrate that Paller's actions rose to the level of conscience shocking.

In any event, even assuming Paller's Fourteenth Amendment right was violated, Paller's actions did not cause the harm. Mrs. Maldonado lost her custody rights over I.M. due to I.M.'s own testimony. *See generally* City & Shapiro Mot. for Summ. J. Exs. A, D, E. Specifically, I.M. testified on multiple occasions that Mrs. Maldonado was physically and mentally abusive toward her, which resulted in her being placed in DHS custody and Hermann ultimately being awarded temporary legal custody. The custody proceedings were driven by I.M.'s own testimony—not Paller's actions. Thus, even assuming Paller's Fourteenth Amendment right was violated, Paller's

actions did not cause the harm and Mrs. Maldonado's § 1983 claim fails. *See Morrow*, 719 F.3d at 165-66 (providing that, to succeed on a § 1983 claim, a plaintiff must have been harmed by "a person acting under color of state law"). Accordingly, the Court will grant Paller's motion for summary judgment on Mrs. Maldonado's § 1983 claim.

Next, Mrs. Maldonado's § 1983 supervisor liability claim against Aguero fails because Aguero never contemporaneously acquiesced in the complained of misconduct. To be liable for negligent supervision under § 1983, "[an individual government] defendant in a civil rights action must have personal involvement in the alleged wrongdoing; liability cannot be predicated solely on the operation of *respondeat superior*." *Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005) (quoting *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988)). Personal involvement can be shown, through "personal direction or actual knowledge and acquiescence, in the wrongs alleged." *McKenna v. City of Philadelphia*, 582 F.3d 447, 460 (3d Cir. 2009) (internal citations omitted). In other words, "[s]upervisor liability may be imposed only where there is: (1) contemporaneous knowledge of the offending incident or knowledge of a prior pattern of similar incidents, and (2) circumstances under which the supervisor's inaction could be found to have communicated a message of approval to the offending subordinate." *Banks v. Rozum*, 639 F. App'x 778, 784 (3d Cir. 2016) (citing *Bonenberger v. Plymouth Twp.*, 132 F.3d 20, 25 (3d Cir. 1997)).

Here, Aguero never contemporaneously acquiesced in the complained of misconduct. Aguero assigned Paller to the Maldonado investigation through his normal course of employment. The only potential issues brought to Aguero's attention were: (1) Paller's previous involvement with Motion—which Paller self-reported to Aguero; and (2) Mrs. Maldonado's initial concerns with Paller's involvement in the case. The misconduct in this action, however, involves Paller's actions with regard to the August safety plan and custody proceedings. The reports of this

11

misconduct were nevertheless sent to Shapiro—not Aguero.  Therefore, there is no evidence that Aguero had contemporaneous, personal knowledge of Paller's alleged misconduct and acquiesced in it. Mrs. Maldonado's supervisor liability claim thus fails and Aguero is entitled to judgment as a matter of law. The Court will grant Aguero's motion for summary judgment on Mrs. Maldonado's § 1983 claim. *See, e.g.*, *Lomax v. City of Philadelphia*, No. 13-1078, 2017 WL 1177095, at *4 (E.D. Pa. Mar. 29, 2017) (granting summary judgment on a § 1983 supervisor liability claim where the supervisor did not have contemporaneous knowledge of, or acquiesce, in the plaintiff's injury).

Next, Mrs. Maldonado's common law negligent supervision claim against Aguero fails because he is entitled to immunity under Pennsylvania's Political Subdivision Tort Claims Act (TCA). Under Pennsylvania law, "no local agency shall be liable for any damages on account of any injury to a person . . . caused by an act of the local agency or an employee thereof or any other person." 42 Pa. Cons. Stat. § 8541. Section 8542 provides nine enumerated exceptions of when negligent acts of an employee may impose liability:

> (1) [v]ehicle liability . . . (2) [c]are, custody or control of personal property . . . (3) [r]eal property . . . (4) [t]rees, traffic controls and street lighting . . . (5) [u]tility service facilities . . . (6) [s]treets . . . (7) [s]idewalks . . . (8) [c]are, custody or control of animals, [and] (9) [s]exual abuse.

*Id.* § 8542 (a)-(b). Mrs. Maldonado concedes her negligent supervision claim does not fit into any of the nine enumerated negligence exceptions, but instead argues Aguero's inaction was willful misconduct that abrogates his TCA immunity.

Under § 8550, an employee of a local agency may also be liable if "the act of the employee caused the injury and such act constituted a crime, actual fraud, actual malice, or willful misconduct . . . ." *Id.* § 8550. To demonstrate willful misconduct, the plaintiff must show "the actor desired to bring about the result that followed, or at least that the result was substantially

certain to follow." *Verde v. City of Philadelphia*, 862 F. Supp. 1329, 1336 (E.D. Pa. 1994) (internal citations omitted). Pennsylvania courts have applied § 8550 to negligent supervision claims. *See McNeal v. Easton*, 598 A.2d 638, 642 (Pa. Commw. Ct. 1991).

Aguero is entitled to TCA immunity because there is no evidence showing he acted with willful misconduct. Mrs. Maldonado claims Aguero engaged in willful misconduct because he promised Mrs. Maldonado he would "handle [Mrs. Maldonado's complaints about Paller]" in July 2016 and he did not follow up with Mrs. Maldonado after their conversation. This argument misses the mark. There is no evidence in the record demonstrating that Aguero acted *willfully* to deprive Mrs. Maldonado of her constitutional right to the care, custody, and control of I.M., or that this was a substantially certain result of his actions. No reasonable jury could find Aguero acted with willful misconduct. He is thus entitled to TCA immunity on Mrs. Maldonado's negligent supervision claim and the Court will grant Aguero's motion for summary judgment on this claim. *See Newlon v. Davis*, No. 13-1213, 2014 WL 2199838, at *5 (W.D. Pa. May 27, 2014) (dismissing negligent supervision claim where no exceptions to TCA immunity applied).

Next, Mrs. Maldonado's fraud claim against Paller fails because there is no evidence that Paller made knowingly false representations to Mrs. Maldonado. To prove common law fraud under Pennsylvania law, a plaintiff must show:

> (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance."

*Overall v. Univ. of Pa.*, 412 F.3d 492, 498 (3d Cir. 2005) (quoting *Gibbs v. Ernst*, 647 A.2d 882, 889 (Pa. 1994)). "Each of these elements must be proven by clear and convincing evidence." *Leo v. State Farm Mut. Auto. Ins. Co.*, 939 F. Supp. 1186, 1194 (E.D. Pa. 1996) (citing *Pittsburgh Live,*

*Inc. v. Servov*, 615 A.2d 438, 441 (Pa. Super. Ct. 1992)). To prove that a false representation constitutes fraud, it must be one regarding "a past or present material fact" but "it is equally clear that a promise to do something in the future and the failure to keep that promise, is *not* fraud." *Greenberg v. Tomlin*, 816 F. Supp. 1039, 1054 (E.D. Pa. 1993) (internal citations omitted) (emphasis in original).

Here, Paller did not make any knowingly false representations to Mrs. Maldonado. Mrs. Maldonado argues Paller made misrepresentations about her previous involvement with the Marcuccis and misrepresented the temporary nature of the August safety plan. However, at no point during the investigation did Paller make any representations to Mrs. Maldonado about her involvement with Motion.[5] Additionally, Paller did not make any misrepresentations during the negotiation of the temporary August safety plan. The August safety plan was, in fact, temporary as it expired at the end of August. The fact that Hermann filed for custody of I.M. and did not return her to Philadelphia does not change this. Moreover, there is no evidence that at the time the August safety plan was put into place, Paller knowingly and falsely represented that the safety plan would be temporary. As a result, no reasonable jury could find, through clear and convincing evidence, that Paller made a material misrepresentation to Mrs. Maldonado. Therefore, Paller is entitled to judgment as a matter of law on Mrs. Maldonado's fraud claim. *See Boardakan Rest. LLC v. Gordon Grp. Holdings, LLC*, No. 11-5676, 2016 WL 6213035, at *15 (E.D. Pa. Oct. 24, 2016) (dismissing plaintiff's fraud claim where plaintiff failed to prove the defendant made a misrepresentation); *see also Riese v. QVC, Inc.*, No. 97-40068, 1999 WL 178545, at *7 (E.D. Pa.

---

[5] Insofar as Mrs. Maldonado claims Paller engaged in fraud by nondisclosure this argument also fails. There is no evidence Paller deliberately omitted this fact to induce Mrs. Maldonado to act in a certain manner. *See Boardakan Rest. LLC v. Gordon Grp. Holdings, LLC*, No. 11-5676, 2016 WL 6213035, at *16 (E.D. Pa. Oct. 24, 2016).

Mar. 30, 1999) (granting summary judgment on a fraud claim where plaintiff failed to produce evidence of knowingly false representations).

Paller is also entitled to judgment as a matter of law on Mrs. Maldonado's intentional infliction of emotional distress for failing to prove extreme and outrageous conduct. In Pennsylvania, intentional infliction of emotional distress occurs when "one who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another . . . ." *Weinstein v. Bullick*, 826 F. Supp. 1193, 1203 (E.D. Pa. 1993) (internal citations and quotations omitted). To satisfy the "extreme and outrageous conduct" element, "the conduct must be so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Hoy v. Angelone*, 720 A.2d 745, 754 (1998) (quoting *Buczek v. First Nat'l Bank of Mifflintown*, 531 A.2d 1122, 1125 (Pa. Super. Ct. 1987)). In this instance, Mrs. Maldonado—having failed to demonstrate that Paller engaged in unconstitutional behavior or made knowing misrepresentations with the intent to remove I.M. from her custody—has not proffered evidence from which a reasonable jury could infer that Paller's conduct was extreme and outrageous. *See Hepps v. Gen. Am. Life Ins.*, No. 95-5508, 1998 WL 564497, at *6 (E.D. Pa. Sept. 2, 1998) (granting summary judgment on an intentional infliction of emotional distress where defendant's conduct was not extreme and outrageous).

Finally, Mr. Maldonado's loss of consortium claim fails as a matter of law. Under Pennsylvania law, "an action for loss of consortium is derivative of the injured party's claim." *Tiernan v. Devoe*, 923 F.2d 1024, 1036 (3d Cir. 1991). Because Mrs. Maldonado's claims all fail, Mr. Maldonado's derivative loss of consortium claim fails. *See, e.g.*, *Smith v. EAN Holdings, LLC*, No. 19-85, 2019 WL 4118651, at *4 (E.D. Pa. Aug. 29, 2019) (dismissing loss of consortium claim

where the substantive claim failed). Summary judgment will therefore be granted in Paller's favor on Mr. Maldonado's loss of consortium claim.

## II.      City of Philadelphia and Jessica Shapiro's Motion for Summary Judgment

Mrs. Maldonado brings § 1983 supervisor liability and negligent supervision claims against Shapiro and a § 1983 claim pursuant to *Monell v. Department of Social Services*, 436 U.S. 658, 694 (1978) against the City. Because Mrs. Maldonado's claims against the City and Shapiro fail as a matter of law and the City and Shapiro are entitled to judgment as a matter, the Court will grant their motion for summary judgment.

Mrs. Maldonado's § 1983 supervisor liability claim against Shapiro fails because she did not acquiesce in the alleged misconduct. In her § 1983 supervisor liability claim against Shapiro, Mrs. Maldonado alleges Shapiro had knowledge of, and acquiesced in, Paller and Aguero's alleged misconduct, which violated her Fourteenth Amendment right to the care, custody, and control of I.M. As discussed, under § 1983, "[s]upervisor liability may be imposed only where there is: (1) contemporaneous knowledge of the offending incident or knowledge of a prior pattern of similar incidents, and (2) circumstances under which the supervisor's inaction could be found to have communicated a message of approval to the offending subordinate." *Banks*, 639 F. App'x at 784.

In this case, Mrs. Maldonado has failed to produce evidence from which a reasonable jury could infer that Shapiro acquiesced in any alleged misconduct relating to Mrs. Maldonado's loss of custody over I.M. After exchanging emails with Attorney Raie regarding Paller's actions on September 16 and September 19, Shapiro (1) informed Attorney Raie she was looking into the issues; (2) forwarded the email to DHS's Deputy Commissioner Gary Williams, Williams's Chief-of-Staff Miriam Hayes, and Executive Assistant Francis Beatrice; and (3) copied three other people on the email, including a DHS lawyer Houlon. Shapiro then spoke with Houlon the next day and

they removed Paller from the case. On September 20, 2016, Shapiro further emailed the City's Inspector General Amy Kurland about the I.M. investigation. Kurland then took over the investigation. The undisputed facts show Shapiro acted timely by investigating the claims of misconduct, removing Paller from the case, and referring the investigation to Kurland. Mrs. Maldonado has therefore failed to prove Shapiro acquiesced in the alleged misconduct and the Court will grant Shapiro's motion for summary judgment on the § 1983 supervisor liability claim. *See Lomax*, 2017 WL 1177095, at *4 (granting summary judgment on a § 1983 supervisor liability claim where the supervisor did not have contemporaneous knowledge of, or acquiesce, in the plaintiff's injury).

Next, Mrs. Maldonado's common law negligent supervision claim fails because Shapiro is entitled to general tort immunity under the TCA. This claim fails for the same reason Mrs. Maldonado's claim against Aguero fails—(1) negligent supervision isn't a viable claim under the TCA's nine enumerated exceptions, *see* 42 Pa. Cons. Stat. § 8541; and (2) there is no evidence that Shapiro engaged in willful misconduct such that she desired Mrs. Maldonado to lose custody of I.M. or that such a result was substantially likely to occur as a result of her actions. As to the latter, Shapiro took multiple affirmative steps to investigate in response to complaints about the alleged misconduct, which led to Paller being removed from the Maldonado case. Furthermore, there is no evidence suggesting Shapiro intended for Mrs. Maldonado to lose custody of her daughter or that it was substantially certain that Shapiro's actions would violate Mrs. Maldonado's right to the care, custody, or control of I.M. Because there is no genuine dispute of material facts and Shapiro is entitled to judgment as a matter of law, the Court will grant Shapiro's motion for summary judgment on Mrs. Maldonado's common law negligent supervision claim. *See Newlon*,

2014 WL 2199838, at *5 (dismissing a negligent supervision and training claim when no exceptions to TCA immunity applied).

Finally, Mrs. Maldonado's § 1983 *Monell* claim against the City fails because there was no underlying constitutional violation by Paller. Generally, "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agent." *Monell*, 436 U.S. at 694. However, "[l]ocal governing bodies . . . can be sued directly under § 1983 . . . where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Id.* at 690. To succeed on a *Monell* claim, a plaintiff must establish: (1) a constitutionally protected right has been violated and (2) the alleged violation resulted from municipal policy or custom, or the deliberate indifference to the rights of citizens. *Id.* at 694. As discussed, there was no underlying violation of Mrs. Maldonado's constitutional rights. *See supra* 10-12. Mrs. Maldonado's *Monell* claim therefore fails and the City is entitled to judgment as a matter of law on this claim. *Bridges ex rel. D.B. v. Scranton Sch. Dist.*, 644 F. App'x 172, 178 (3d Cir. 2016) ("Appellants cannot recover under [*Monell*] for failure to train because there was no underlying constitutional violation.").

### III.   Christopher Hermann's Motion for Summary Judgment

Lastly, Mrs. Maldonado brings three claims against Hermann: (1) conspiracy pursuant to § 1983, (2) fraud, and (3) intentional infliction of emotional distress. Mr. Maldonado also brings a derivative loss of consortium claim. The Maldonados' claims against Hermann fail as a matter of law, and the Court will grant Hermann's motion for summary judgment.

First, Mrs. Maldonado's § 1983 conspiracy claim fails because she has not produced evidence demonstrating an agreement existed between Hermann and Paller to violate her Fourteenth Amendment right. To succeed in a conspiracy claim pursuant to §1983, Mrs.

Maldonado must show "(1) the existence of a conspiracy involving state action; and (2) a [deprivation] of civil rights in furtherance of the conspiracy by a party to the conspiracy." *Piskanin v. Hammer*, No. 04-1321, 2005 WL 3071760, at *4 (E.D. Pa. Nov. 14, 2005) (internal citations and quotations omitted). Once a federally protected civil right is shown to be the objective, as it is here, "'the rule is clear that' the plaintiff 'must provide some factual basis to support the existence of the elements of conspiracy: agreement and concerted action.'" *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 295 (3d Cir. 2018) (internal citations and quotations omitted). To satisfy the agreement element, the plaintiff "must demonstrate that 'the state actors named as defendants in the[] complaint somehow reached an understanding to deny [the plaintiff] of his rights.'" *Id.* (quoting *Kost v. Kozakiewiczi*, 1 F.3d 176, 185 (3d Cir. 1993). Whereas here, the plaintiff does not have "direct proof, that [a] 'meeting of the minds' or [an] 'understanding or agreement to conspire'" took place, circumstantial evidence may be sufficient. *Id.* (citing *Startzell v. City of Philadelphia*, 533 F.3d 183, 205 (3d Cir. 2008)). Circumstantial evidence that can infer an agreement was made includes the actions of the alleged conspirators, the time, the objective, and the parties involved. *Id.*

Here, there is no factual basis from which a reasonable jury could find Paller and Hermann came to an agreement to deny Mrs. Maldonado her Fourteenth Amendment right to the care, custody, and control of I.M. Mrs. Maldonado's conspiracy claim is based merely on her own suspicions and speculations that Hermann and Paller conspired to strip her of her custodial rights. In support of her claim, Mrs. Maldonado claims Hermann and Paller lied during the custody proceedings, and Hermann violated the August safety plan and lied to the police about his custody over I.M. Mrs. Maldonado's assertions that Hermann and Paller lied under oath, however, are not supported by facts, and do not create an inference that there was an agreement between Hermann

and Paller. As to Mrs. Maldonado's claim that Hermann violated the August safety plan by allowing I.M.'s contact with the Marcuccis twice—there were no statements in the August safety plan precluding I.M. from having contact with the Marcuccis. *See* Pls.' Resp. to Paller & Aguero Mot. for Summ. J. Ex. M. Further, this argument does not demonstrate a meeting of the minds between Paller and Hermann. Mrs. Maldonado also points to the fact that Hermann made a statement to a local police officer that he had custody over I.M. without restrictions as evidence of a conspiracy. But, again, this evidence does not demonstrate a meeting of the minds between Paller and Hermann to deny Mrs. Maldonado her Fourteenth Amendment right to the care, custody, and control of I.M. Because Mrs. Maldonado has failed to proffer evidence from which a reasonable jury could find there was a meeting of the minds between Paller and Hermann, Hermann is entitled to summary judgment on Mrs. Maldonado's § 1983 conspiracy claim. *See Jutrowski*, 904 F.3d at 295-96 (granting summary judgment on a conspiracy claim where the plaintiff failed proffer evidence of an agreement and relied on suspicions and speculations).

Next, Mrs. Maldonado's common law fraud claim fails because she has failed to proffer evidence from which a reasonable jury could find, by clear and convincing evidence, that Hermann made a fraudulent representation to her. In this claim, Mrs. Maldonado asserts Hermann acted fraudulently by representing he would not allow any contact with the Marcuccis and the August safety plan was temporary. As stated, to prove common law fraud under Pennsylvania law, the plaintiff must show:

> (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance."

*Overall v. Univ. of Pa.*, 412 F.3d 492, 498 (3d Cir. 2005) (quoting *Gibbs v. Ernst*, 647 A.2d 882, 889 (Pa. 1994)). "Each of these elements must be proven by clear and convincing evidence." *Leo v. State Farm Mut. Auto. Ins. Co.*, 939 F. Supp. 1186, 1194 (E.D. Pa. 1996) (citing *Pittsburgh Live, Inc. v. Servov*, 615 A.2d 438, 441 (Pa. Super. Ct. 1992)).

Mrs. Maldonado has failed to demonstrate that a reasonable jury could find, by clear and convincing evidence, that Hermann knowingly misrepresented that I.M. would not be in contact with the Marcuccis and the August safety plan was temporary. Initially, there are no statements in the August safety plan barring Hermann from allowing I.M. to have contact with the Marcuccis, nor did Hermann make any representations regarding this fact. *See* Pls.' Resp. to Paller & Aguero Mot. for Summ. J. Ex. M. Next, the August safety plan was, in fact, temporary because it expired at the end of August—thus there was no misrepresentation that the August safety plan was temporary. The fact that Hermann filed a petition for custody of I.M., enrolled I.M. into school in Maryland, and did not return I.M. to Philadelphia after the plan expired does not change the fact that the August safety plan was temporary or amount to actionable fraud. *Greenberg*, 816 F. Supp. at 1054 ("[I]t is equally clear that a promise to do something in the future and the failure to keep that promise, is *not* fraud." (internal citations omitted)). Therefore, Mrs. Maldonado has failed to proffer evidence from which a jury could conclude that Hermann made a fraudulent misrepresentation to her. Hermann is thus entitled to summary judgment on Mrs. Maldonado's common law fraud claim. *See Boardakan Rest. LLC*, 2016 WL 6213035, at *15.

Third, Mrs. Maldonado's intentional infliction of emotional distress claim fails because she has failed to prove Hermann engaged in extreme and outrageous conduct. As discussed, to succeed on a claim for intentional infliction of emotional distress, the plaintiff must demonstrate the defendant's conduct was "extreme and outrageous." *Weinstein*, 826 F. Supp. at 1203. To satisfy

the "extreme and outrageous conduct" element, "the conduct must be so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Hoy*, 720 A.2d at 753-54 (quoting *Buczek*, 531 A.2d at 1125). Without any evidence of conspiracy or fraudulent activity, there is no extreme and outrageous conduct in this case. Rather, the record suggests that Hermann was an uncle willing to help his niece when she was in an unpleasant situation. Because Mrs. Maldonado has failed to prove Hermann's actions were extreme and outrageous, Hermann is entitled to summary judgment on Mrs. Maldonado's intentional infliction of emotional distress claim. *See Hepps*, 1998 WL 564497, at *6 (granting summary judgment on an intentional infliction of emotional distress claim where defendants' conduct failed to reach the level of extreme and outrageous).

Finally, because Mrs. Maldonado's claims all fail, Mr. Maldonado's derivative loss of consortium claim fails. *Smith*, 2019 WL 4118651, at *4 (dismissing loss of consortium claim where the substantive claim failed). Hermann's motion for summary judgment on Mr. Maldonado's loss of consortium claim will therefore be granted.

**CONCLUSION**

In sum, because there are no genuine disputes of material fact and the Maldonados' claims fail as a matter of law, the Court will grant Defendants' motions for summary judgment and enter judgment in their favor on all claims in the Second Amended Complaint.

An appropriate order follows.

BY THE COURT:


/s/ Juan R. Sánchez
Juan R. Sánchez, C.J.

22